**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| T.J., a minor, by his parents and natural guardians, A.J. and H.J., | Civil Action |
| Plaintiffs, | No. 22-cv |
| v. | |
| Tredyffrin-Easttown School District, | |
| Defendant. | |

**COMPLAINT**

**I.   INTRODUCTION**

1.      This action arises under Title II of Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq*. ("ADA"), its regulations against discrimination on the basis of disability and its Effective Communication regulation, 28 C.F.R. § 35.160.

2.      This action also seeks attorney fees under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1415(i)(3)(B)(i)(I), for relief they obtained in a due process hearing under IDEA.

3.      This is an appeal from the decision, dated July 15, 2022, of a Pennsylvania Special Education Hearing Officer, attached as Exhibit 1.

4.      In the underlying due process proceeding, the parents of T.J., a student with disabilities and a student in the Tredyffrin-Easttown School District ("District"), challenged the failure of the District to provide a free,  appropriate public education ("FAPE") and the auxiliary aids and services required by the Americans with Disabilities Act, during the 2020-21 and 2021-22 school years.

1

5.      T.J. uses an Augmentative and Alternative Communication ("AAC") system as his primary mode of communication. Without this system, he cannot enjoy an equal opportunity to participate in, and enjoy the benefits of, the service, programs, and activities of the Tredyffrin-Easttown School District.

6.      The District has failed to provide the AAC services that are necessary to provide T.J. with an equal opportunity for effective communication.

7.      In this action, the parents of T.J. challenge that part of the Hearing Officer's Order that denied relief for the District's violation of T.J.'s right to effective communication.

8.      The parents also seek attorney fees under the Individuals with Disabilities Education Act, 20 U.S.C. § 1415(i)(3)(B)(i)(I), for the relief that they did obtain in the underlying administrative action, and under the ADA, 42 U.S.C. § 12205, for their fees and costs in the present action.

## II.   JURISDICTION AND VENUE.

9.      Jurisdiction is based upon 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States. Jurisdiction is also based upon the ADA, 42 U.S.C. §12133.

10.      Plaintiffs have fully exhausted their administrative remedies as required by the Individuals with Disabilities Education Act, 20 U.S.C. § 1415(f) and (g). Plaintiffs raised claims under the ADA in the underlying due process proceeding, and the Hearing Officer dismissed those claims, holding that she did not have jurisdiction to decide them.

11.      This civil action is timely filed under 20 U.S.C. §1415(i)(2)(8), as the decision of the Hearing Officer was rendered on July 15, 2022, and this action is filed within 90 days of that decision. Pennsylvania state law contains no explicit time limitation for bringing such an action.

12.     Venue in this district is proper under 28 U.S.C. § 1391(b). All parties are resident in or maintain offices in Chester County, Pennsylvania, within the Eastern District of Pennsylvania.

III.    PARTIES.

13.     T.J. was born on August 6, 2013. He lives with his father, mother and older sister in Paoli, Pennsylvania, within the boundaries of the Tredyffrin-Easttown School District.

14.     Throughout his education, T.J. has been eligible for special education and related services under the Individuals with Disabilities Education Act, and no party disputes his eligibility for these services. T.J. has impairments that substantially limit him in major life activities, and thus is entitled to the protections of the Americans with Disabilities Act.

15.     The Tredyffrin-Easttown School District is a Local Education Agency with its offices at 940 West Valley Road, Unit 1700, Wayne, Pennsylvania 19087, in Chester County.

16.     The District is responsible for providing special education and related services to all eligible children within its borders. It is responsible for honoring the substantive and procedural rights of eligible children and their parents under the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act, the Americans with Disabilities Act and Chapter 14 of the Pennsylvania Education Code.

17.     The District is a public entity responsible for compliance with the guarantees of Title II of the Americans with Disabilities Act.

IV.     FACTS.

**The Effective Communication Regulation of the Americans with Disabilities Act.**

18.     The Americans with Disabilities Act requires public entities, including school districts, to provide auxiliary aids and services to enable persons with disabilities equal access to the programs and services operated by those entities. Under ADA regulation 28 C.F.R.

3

35.160(a)(1), the District is obligated to ensure that communication with students with disabilities in its programs must be "as effective as communications with others":

> A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others.

28 C.F.R. § 35.160.

19.     The regulation requires public entities to furnish auxiliary aids and services where necessary to afford "an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).

20.     Under 28 C.F.R. § 35.160(b)(2), "[t]he type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place."

21.     In determining what types of auxiliary aids and services are necessary, "a public entity shall give primary consideration to the requests of individuals with disabilities." *Id.*

22.      The IDEA does not restrict a student's ability to pursue claims under the ADA, and compliance with the IDEA does not immunize a party from liability under the ADA. Thus, even if a school district prevails on a student's IDEA claims, it may be required to provide additional relief under the ADA. *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 235 (3d Cir. 2013), *citing K.M. v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1102 (9th Cir. 2013); *Ellenberg v. N.M. Military Inst.*, 478 F.3d 1262, 1281-82 (10th Cir. 2007) and *Hornstine v. Township of Moorestown,* 263 F. Supp. 2d 887, 901 (D.N.J. 2003).

**The Failure of the Tredyffrin-Easttown School District to Provide Effective Communication Services to T.J.**

4

23.     T.J. has an extremely rare genetic condition that causes significant apraxia, including apraxia of speech, and significant needs in communication and sensory regulation. Most of his speech is not intelligible to an unfamiliar listener.

24.     The District acknowledges that T.J. has extremely complex disabilities and that he needs Alternative Augmentative Communication (AAC) to communicate successfully, due to his Childhood Apraxia of Speech. Yet it has refused to date to develop IEP goals in this critical area.

25.     The District has acknowledged that T.J.'s AAC device, a PRiO (a type of dedicated iPad) loaded with the software program Language Acquisition through Motor Planning (LAMP), is appropriate for him. It has acknowledged that T.J. should be taught to communicate using Aided Language Stimulation (ALS) with his AAC device.  Aided Language Stimulation is actively modeling use of an AAC device use while also speaking to the individual who uses the device.

26.     However, the District has failed to require T.J.'s teachers and staff to use this method accurately or appropriately with him. In a report shared with the District, Parents' expert Richard Lytton recommended the use of ALS in December, 2019, P-7 at 5, yet it took the District more than a year to add ALS to T.J.'s IEP in response to parental concerns.

27.     LAMP is based on the principle of semantic compaction, which is a system of representing language for AAC users in which sequences of icons are combined to form words and phrases. The AAC user is taught the motor plans to combine icons efficiently by a communication partner who models the sequence, using ALS. Semantic compaction allows AAC users to communicate with a much smaller number of icons than a system based on single-meaning pictures. *See* N.T. 1405-1407.

28.     Expert observations of the teachers working with T.J., their statements about T.J.'s use of his AAC device and analysis of the Realize Language Log that is part of the LAMP software provide conclusive evidence that District staff are not teaching T.J. the skills he needs to make progress in using the device to communicate.

29.     T.J.'s IEP states that he is to use his AAC device throughout the school day. However, use of the device is sporadic and inconsistent, and District personnel do not use it appropriately.

30.     Using AAC should be natural and easy for the user. T.J. should feel that if he cannot communicate verbally what he wishes to say, he can communicate with his device.  The District's use of AAC with T.J. is not natural and easy but coercive and forced. The approach used by District staff is to drill him in single words, over and over.

31.     Proof that the device is not used throughout the school day is provided by the Realize Language Log, a feature of the LAMP software that keeps data on the number of "hits" on the device, the time of day and duration of use of the device, and the specific words and phrases that the device is used to produce.

32.     In her 2021 evaluation, Dr. Hill analyzed data from the Realize Language log showing large amounts of time during the school day in which neither T.J. nor his communication partners were using the device. S-145 at 12.

33.     H.J. also concluded that the device is rarely used and that the majority of communications with the device are single words. At times, the device is used to spell a word. T.J. is not learning motor plans with the device. N.T. 1503-1507, P-218, 219, 220, 221 and 222.

34.     In contrast to the ineffective implementation of T.J.'s services in the District, T.J.'s parents have arranged for their son to receive many services outside of school. For three

summers in a row, he attended an intensive AAC camp at West Chester University. He practiced

AAC with borrowed devices from Temple University. He received services from Salus

University. He received motor speech intervention from the most qualified professionals in the

area. He received intensive occupational therapy intervention from a leading expert in sensory

regulation and her colleagues at A Total Approach. N.T. 1441-45, P-12, P-13, P-14, P-15, P-16.[1]

35.     T.J.'s parents have shared an extensive set of evaluations and reports from private

providers, including highly specialized experts at the top of their respective fields. *See* P-212.

36.     In her testimony in the due process hearing, H.J. showed that during the period

from February 1 to May 11, 2022, the "Top Ten Words" feature of the log (the words that T.J.

used most frequently) showed that the device was used primarily to play the song "Eensy-

Weensy Spider," a favorite of T.J.'s. From January 1 to January 16, the device was not used. On

January 19, 2022, the device was used to play "Row, Row, Row Your Boat" and by the speech

therapist telling T.J. to "look at my mouth." N.T. 1507-1509. No motor plans were involved.

37.     On February 9, 2022, the parents and their experts were allowed a limited

observation of T.J.'s program to prepare for the due process hearing. The observation was

scheduled from 9 to 11 AM, but was about 25 minutes shorter because T.J.'s school bus was late.

38.     The Realize Language Log showed that during the time set aside for the

observation, use of the device increased dramatically. The log shows the cells representing each

time period in white when the device is not used, and the cells are colored varying shades of

green when it is in use. From 9 to 11 AM the cells were dark green, showing that the device

received many hits. N.T. 1509-1510. Yet T.J. did not practice any motor plans during this time

---

[1] References are to the administrative record of the due process hearing. "N.T." refers to the Notes of Testimony from the hearing. "P-" and "S-" refer to the exhibits that were introduced by the parents and the school district respectively.

period. When he worked with his special education teacher, they did not use semantic compaction; rather, he was required to repeat a single word over and over. N.T. 1511-12. When he worked with the speech therapist, "Row, Row, Row Your Boat" appeared again, as well as the speech therapist's saying "I like it." Since LAMP treats "I like it" as a single-word utterance, this did not require T.J. to utter a phrase. During the following reading lesson with the special education teacher, concerning a story called "We," T.J. pressed the button for "we" on his device, but did not practice a motor plan. N.T. 1513-14. After the camera was turned off at 11 AM, the Realize log shows hits only for going to the bathroom, "Row, Row, Row Your Boat" and instructions such as "quiet feet" and "jump" in physical therapy. N.T. 1514. Icons were pressed with no context. N.T. 1515.[2]

39.     The AAC evaluation the District received from the Chester County Intermediate Unit recommended that District personnel use "descriptive teaching" with T.J. Descriptive teaching is a style of teaching an AAC communicator in which the teacher mentions and references context-specific words that have not been programmed into the student's device. The teacher then teaches the concepts behind the words using high frequency, common words that are already in the communicator's AAC system.

40.     T.J.'s special education teacher, who received training in Verbal Behavior and discrete trial training from the PaTTAN Autism Initiative, testified that she uses Aided Language Stimulation with T.J.. N.T. 84, 87. Yet when she was observed on February 9, 2022, by parents' experts, she did not use ALS correctly, but rather used a procedure that more closely resembled

---

[2] The District's AAC evaluator did not testify in the hearing but did testify in a prior hearing, and her testimony in that hearing is in evidence in the underlying administrative proceeding.  It appears that her evaluation of T.J. involved a limited amount of observation time. She recorded 120 minutes on April 9, 2021, but this included AAC assessment and an AAC profile, in addition to observation. She recorded 30 minutes of observation in regular class on May 14. S-171.

mand training, a Verbal Behavior intervention. The correct procedure for implementing ALS requires the communication partner first to obtain joint attention with the AAC user, then to model the sequence of icons while the user watches; and then to provide the user with an opportunity to communicate back using the partner's model. N.T. 283.

41. Instead, T.J.'s teacher modelled the icon sequence while T.J. rarely, if ever, attended to her. After she presented the model, she moved on to something else without providing an opportunity for T.J. to communicate using an icon sequence. N.T. 295-96. While feeding T.J. strawberries, she used his device to get him to say "strawberry" over and over to request each small bite. She did not teach T.J. a motor plan, or expect him to use one, but took him to the place in the device where all he had to do was press a single key for "strawberry." Since strawberries were the only food being offered, the result was that T.J. was not learning a motor plan or indicating a choice but practicing manding for a strawberry. N.T. 297-299.

42. The teacher did not use descriptive teaching with T.J. She could have used the opportunity presented by the strawberry snack to ask, "Tell me about strawberries" or "What do you like about strawberries?' or similar open-ended questions that could have engaged T.J.'s interest and creativity.

43. The teacher modelled "we are putting on shoes" as single words and not as a complete phrase using semantic compaction.

44. Although the Chester County Intermediate Unit evaluator recommended using a prompt hierarchy while teaching T.J., during observations, District personnel did not use a prompt hierarchy, but used the highest level of prompting, so that he was prompted to press the icon for each word he was asked to repeat, thus teaching him to be prompt dependent.

45.     Other observations of T.J. in school suggest that his teachers used his device to press the key for a single word, rather than to express a sentence or phrase. *See, e.g.,* P-205 at 3 (Alice Udvari-Solner observed T.J.'s special education teacher modeling "we, are, putting, on, shoes" as separate words rather than using semantic compaction).

46.     Despite the inappropriate use of AAC and the District's insistence that T.J. does not initiate use of his device, classroom observations indicate that T.J. does initiate communication with the device. *See, e.g.* P-205 at 3.

47.     Dr Katya Hill, a leading national and international expert in AAC who played an extensive role in developing the LAMP software, concluded, after an extensive review of educational records, that the school team would benefit from an immersive AAC training program focusing on using strategies, tools and resources to support building team skills in AAC and that training should be designed to observe team members in the classroom and identify opportunities for using strategies and techniques presented and rehearsed in a training session. S-145 at 12. The District has declined to provide such training.

48.     In contrast, the consultation logs of the AAC specialist from the Chester County Intermediate Unit utilized by the District to evaluate T.J. and train his staff, provided only 55 minutes of training and 75 minutes of consultation to T.J.'s entire team during the 2020-21 school year, and 3.3 hours of training and 3.0 hours of consultation to the entire team during the 2021-22 school year. The greater part of the consultant's work for the district consisted of conducting the evaluation that the parents had urged the District to conduct and in preparing to testify in a due process hearing. S-171.

49.     In stark contrast, H.J. has received extensive training in AAC: at least 7 full days of training and at least 13 additional hours. P-178.

50.     In addition, the parents use LAMP extensively at home, where they have the software installed on a laptop as well as T.J.'s PRiO and iPad. The family speaks Marathi at home and are able to access the LAMP software with Marathi words in AAC in the Cloud, which is installed on all their mobile phones. N.T. 1556-59.

51.     It is difficult to escape the conclusion that District staff either do not understand ALS or do not believe it is important for T.J.. In the Speech and Language Evaluation Summary in the Revaluation Report for T.J. of January 2022, S-146 at 50, ALS is not mentioned, nor is using AAC for peer communication and access to general education identified as a Speech-Language need. *Id.* at 51.

52.     In December, 2019, Mr. Lytton made three recommendations for the use of AAC that he considered "critical": (1) that T.J.'s prompt dependence be reduced by using ALS and a least-to-more prompting hierarchy with pauses and reinforcement to avoid over prompting;  (2) that evidence-based language literacy intervention strategies be applied consistently and systematically by T.J.'s team to measure the effectiveness of AAC treatment using baseline data; and (3) that language-literacy activities should start with T.J.'s present levels of phonological awareness and emerging literacy.

53.     Dr. Katya Hill's team made virtually the same recommendations in the summer of 2021. P-5 at 2.  By the end of the due process hearing, the District had failed to implement any of these recommendations, and proposed that only one of them, teaching phonological awareness and emerging literacy, be added to T.J.'s IEP, and then only because a District consultant had recommended that addition. The District continued to teach only one aspect of reading, matching sounds to letters, even though T.J. was being taught by a private reading specialist and making progress in all five components of reading recognized by the National Reading Panel.

54.     Although the District's own evaluator recommended that T.J. continue to develop his skills in AAC, the District uses two inappropriate methods of teaching language: the Total Communication Approach and Functional Communication Training. Total Communication, in which nonverbal methods of communication are as accepted as verbal methods, is inappropriate because it teaches T.J. that he does not need to use language. N.T. 299. This is counterproductive because T.J. needs to learn receptive and expressive language.

55.     As the District uses the Total Communication approach, District personnel do not model T.J.'s nonverbal communication attempts with his AAC device, thus encouraging him to continue to use nonverbal communication.  The Realize Language Log does not show any data in which the team accepted nonverbal communication and then modelled that nonverbal communication on AAC, which would have given T.J. auditory feedback on what he was trying to say in AAC and where the words are located on his device.

56.     The other method, Functional Communication Training, is similar, in that its goal is to encourage T.J. to communicate his wants and needs without using maladaptive behavior. At best, it is duplicative of teaching T.J. to communicate using ALS, and at worst it undermines his use of AAC.

57.     The District continues to use inferior methods of teaching language to T.J. although it is well-established that he communicates more effectively with his PRiO than he does with speech. Dr. Hill's team found that T.J. produced longer utterances on his PRiO than he produced verbally during the same community activity. For example, 40% of T.J.'s spoken utterances consisted of a single word. In contrast, only 25% of utterances generated on his SGD consisted of a single word, with the remaining 75% of utterances generated on his SGD consisting of 2 to 3 words, both with and without prompting. Additionally, T.J. was able to

utilize the present progressive tense more frequently using Words for Life than he was able to utilize verbally. S-145 at 8. T.J. also used verbs, adjectives, nouns, pronouns, and prepositions independently using his SGD with Words for Life. *Id.*

58.     The evaluation by Dr. Hill and her colleagues was conducted over a period of three days, including observations both in the clinic and a variety of natural settings. It was much more thorough and extensive than the evaluation conducted by the District's evaluator.

59.     The District's evaluator used the District's iPad – the device that T.J. used in school before he was allowed to bring to school the PRiO he used at home – which does not have a keyguard or other accessories as the PRiO does.

60.     The keyguard is critical for T.J. to use the device appropriately. Because of his apraxia and difficulty with fine motor control, without a keyguard, he has great difficulty localizing his pointer finger to press the correct key on the device. Dr. Hill's team found that his accuracy in targeting the correct icons was 70% with the keyguard and only 36% without the keyguard. S-145 at 7. The absence of a keyguard on the iPad significantly compromised T.J.'s ability to use the device in school.

61.     The District acknowledged that when they received the iPad for T.J., it lacked a keyguard, but tried to claim that they would have ordered a keyguard, but H.J. told them that T.J. did not need a keyguard. N.T. 1941; N.T. 1039-40. This claim is not believable, given H.J.'s extensive testimony about the importance of the keyguard to T.J.'s use of the device and the frustration he experienced from being unable to type accurately. Dr. Katya Hill corroborated this testimony. ODR No. #25622 2122, N.T. 157-59, 215.

**The Hearing Officer's Errors.**

62.     The Hearing Officer held that the District had provided a free, appropriate public education during the two years before the parents filed their complaint, "based on information known at the time." Hearing Officer Decision (hereinafter "H.O. Dec."), Exhibit 1 at 42. As it applies to the District's use of AAC with T.J., that statement is clearly erroneous.  During the relevant period, a great deal was shared with the District about T.J.'s ability to communicate with AAC and the importance of using Aided Language Stimulation as a consistent part of his educational program.

63.     For example, H.J. had provided a detailed overview of T.J. as an AAC user to the school team shortly after T.J. transitioned from preschool to the District. P-25. She also provided records concerning T.J..'s use of AAC from the school district in Delaware where T.J. attended preschool. As the Hearing Officer acknowledged, the Parents provided Mr. Lytton's report of December, 2019, which made extensive recommendations for integration of AAC into T.J.'s educational program, to the school team. Exh. 1 at 9.

64.     The Hearing Officer's statement is also directly contrary to Third Circuit precedent. In *M.C. v. Central Regional School District*, 81 F.3d 389 (3d Cir. 1996), the Court of Appeals held that it is the school district's obligation and legal duty to determine whether a student with disabilities is receiving an appropriate education, and if not, to take appropriate corrective measures.

65.     The Hearing Officer also erred in holding that "[t]he major recommendations of the private and District speech/language pathologists have been implemented throughout the time period in question," including ALS, and that the school team had been provided "substantive and essential training" in the use of AAC. Exh. 1 at 41-42. *See* N.T. 1392-1414,

1507-17).  The evidence showed that ALS and descriptive teaching using AAC were seldom
implemented and were not implemented correctly.

66.     The Hearing Officer erred in completely disregarding the evidence of T.J.'s actual
communication in school in the Realize Language Log. She does not even cite the log in her
opinion. The log contains the best evidence of when and how often the device was used, the
duration of its use, the time of day when it was used, what it was used to communicate, and
whether ALS and descriptive teaching were implemented with T.J.

67.     The Hearing Officer erred in failing to apply the correct standard for determining
whether the District had provided an appropriate education to T.J., that is, whether it developed
and implemented an IEP that was reasonably calculated to enable T.J. to receive meaningful
educational benefit in light of his potential. Exh. 1 at 36, *citing P.P. v. West Chester Area School
District*, 585 F.3d 727, 729-30 (3d Cir. 2009)(citations omitted).

68.     Nevertheless, the Hearing Officer found that "additional training would benefit
District staff to implement all of the steps of ALS, including Student having ongoing actual
opportunities to practice modeled sequences on the AAC device." Exh. 1 at 42.

69.     The Hearing Officer also found that the evidence did not demonstrate that
functional communication training or Verbal Behavior methods were appropriate for T.J. and
ordered that goals based on these methods be removed from T.J.'s IEP. Exh. 1 at 43.

70.     Nevertheless, the Hearing Officer held, without any basis, that it was reasonable
to include these goals in the IEP based on what was known at the time, and declined to award
compensatory education for the period when these interventions were implemented. Exh. 1. At
42.

71.     The only relief awarded by the Hearing Officer in the area of communication and use of AAC was compensatory education of one hour per week as a remedy for the District's failure to provide facilitation of peer interactions and communication.

72.     Even if the Hearing Officer's conclusion that T.J. received a free, appropriate public education under IDEA was correct, he still would be entitled to relief under the ADA's Effective Communication regulation, which imposes a different and a higher standard.

73.     Since the Hearing Officer's decision was issued, use of the device in school has increased, but it falls far short of the equal opportunity standard required by 28 C.F.R.35.160.

74.     The Realize Language Log shows that even after the hearing, there has been no two way communication between T.J. and his communication partner.

75.     The communications recorded in the log consist of it demands from the District communication partner of commands such as "chew," "quiet voice", "quiet body." or requests from T.J. for music selections that needed no response or were not given a response .

76.     The peer social interaction reported by the District are "push me [on the swing]" + the peer's name. T.J. already had mastered the motor plan for "push me" + the peer's name at private language camps in years past.

## COUNT I
## Americans with Disabilities Act

77.     The Tredyffrin-Easttown School District has intentionally, purposefully and with deliberate indifference violated the rights of T.J. Jawale secured by the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 *et seq.,* 28 C.F.R. §§ 35.130 and 35.160, by

        a.   Subjecting T.J. to discrimination, in violation of 28 C.F.R. § 35.130(a);

16

b.  Excluding T.J. from participating in and denying him the benefit of District services, programs, and activities on this basis of his disability, in violation of 28 C.F.R. §§ 35.130(a) and 35.160;

c.  Denying T.J. the opportunity to participate in and benefit from aids, benefits, and services on a basis equal to that afforded others, in violation of 28 C.F.R. § 35.130(b)(1)(ii) and 35.160;

d.  Refusing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination against T.J., in violation of 28 C.F.R. § 35.130(b)(7);

e.  Providing different or separate aids, benefits, or services to T.J. than are provided to others, although such action is not necessary to provide him with aids, benefits, or services that are as effective as those provided to others, in violation of 28 C.F.R. §§ 35.130(b)(iv) and 35.160;

f.  Failing to administer services, programs, and activities for T.J. and other students in the most integrated setting appropriate to the needs of qualified individuals with disabilities, in violation of 28 C.F.R. § 35.130(d);

g.  Limiting T.J. in the enjoyment of rights, privileges, advantages, or opportunities enjoyed by others receiving the aid, benefit, or service, in violation of 28 C.F.R. §§ 35.130(b)(1)(vii) and 35.160;

h.  Failing to take appropriate steps to ensure that its communications with T.J. are as effective as its communications with others, in violation of 28 C.F.R. § 35.160.

17

78.    Providing appropriate AAC services to T.J. will not represent a fundamental alteration of the District's educational program. The District's IEP for T.J. already provides that AAC will be available to T.J. throughout the school day.

79.    Providing appropriate AAC services to T.J. will not constitute an undue burden.

## COUNT II
### Attorneys' Fees and Costs for Administrative Proceeding and Action in this Court

80.    Plaintiffs incorporate the foregoing paragraphs fully by reference herein.

81.    Under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1415(i)(3)(B)(i)(I), "[i]n any action or proceeding brought under this section [20 U.S.C. § 1415], the court, in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." A "prevailing party" is a party who succeeds on any significant issue in litigation. *See Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 790-91 (1989); *M.R. v. Ridley Sch. Dist.*, 868 F.3d 218, 224 (3d Cir. 2017).

82.    Despite the Hearing Officer's award of only limited relief in the area of communication and use of AAC, the Hearing Officer did award important relief in other areas, including sensory regulation, development of supplementary aids and services for T.J. in general education classes and removal of inappropriate goals from the IEP. Plaintiffs are entitled to attorney fees and costs under IDEA for that relief.

83.    Attorney fees and costs are also available under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12205, which provides that "[i]n any action or administrative proceeding commenced pursuant to this chapter, the court or agency, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses, and costs."

84.   Plaintiffs seek reasonable attorney fees and costs under IDEA for the underlying administrative action and reasonable attorney fees, litigation expenses and costs under the ADA for the present action.

**WHEREFORE,** plaintiffs respectfully request that the Court award the following relief:

1. Receive the record of the administrative proceeding;

2. Receive additional evidence at the request of a party;

3. Find and declare that the Tredyffrin-Easttown School District, by failing and refusing to provide appropriate AAC services, has violated the Americans with Disabilities Act and its Effective Communication regulation, 29 C.F.R. 35.160;

4. Enjoin the District from further violation of the Act;

5. Order the District to provide adequate training in Aided Language Stimulation and the use of LAMP;

6. Order the District to assure that its personnel implement the AAC services T.J. needs throughout the school day;

7. Award compensatory education as a remedy for the District's failure to provide appropriate AAC services to T.J.;

8. Award such other relief as is necessary, just and proper for T.J. to receive equal access to the programs, services and benefits of the Tredyffrin-Easttown School District.

October 13,  2022                    Respectfully submitted,

                                     REISMAN CAROLLA GRAN & ZUBA LLP


                                     /s/ Judith A. Gran
                                     PA ID No. 40134

19

19 Chestnut Street
Haddonfield, NJ 08033
t 856.354.0071
f 856.873.5640
judith@rcglawoffices.com